## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| RAVEN WOLF C. FELTON JENNNINGS II and RAYMOND DOUGLAS | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  4:20-cv-00584-JAR |
| | ) | |
| CITY OF UNIVERSITY CITY, MISSOURI | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

Since at least 2019, Defendant University City has aggressively suppressed performance and speech on and adjacent to the public sidewalks in a commercial and entertainment district of University City known as the Delmar Loop ("the Loop").  Plaintiff musicians, other performers, street preachers, and protestors have been repeatedly prevented from exercising their First Amendment rights by an unconstitutionally vague obstruction ordinance enforced in an overly broad and arbitrary manner in violation of the First and Fourteenth Amendments.  University City's enforcement instructions and other policies further prohibited Plaintiffs and others from engaging in expressive activities while stationary and from engaging in expressive activities without a permit, in violation of the First Amendment.

## SUMMARY OF UNCONTROVERED MATERIAL FACTS

From at least January 1, 2019 to July 21, 2020 (nearly three months after this suit was filed), University City Ordinance § 215.720, Obstructing Public Places, made it "unlawful for any person to stand or remain idle . . . in a public place in such a manner so as to . . . obstruct any . . . public sidewalk or any other public place or building by hindering or impeding or tending to hinder or impede the free and uninterrupted passage of vehicles, traffic or

pedestrians."  Statement of Uncontroverted Material Facts ("SUMF") ¶ 9.  City Manager Gregory Rose, who holds the power to enforce all municipal laws and ordinances and is responsible for ensuring the municipal code is implemented and equitably enforced throughout the city, testified that under the original ordinance, "if an individual was simply stationary for a period of time, it could be interpreted that that person was tending to obstruct."  SUMF ¶ 11.

Beginning no later than June 2019, University City aggressively enforced the original obstruction ordinance to broadly prohibit expression in the Delmar Loop by preventing musicians, performers, and others engaged in public speech from remaining stationary on public sidewalks, regardless of whether they were actually obstructing the passage of any pedestrians.  City Manager Rose, Police Chief Larry Hampton, and others repeatedly reinforced this interpretation and related policies (SUMF ¶¶ 19-66), including:

- On June 22, 2019, Chief Hampton directed his department supervisors: "No demonstrations or demonstrators will be permitted to stand still in right of way property while demonstrating.  Meaning in order to legally demonstrate within their rights they are to be instructed to keep moving without blocking any other persons rights of ways to the sidewalks / parking lots (that are not private).  This will go for street musicians as well."  SUMF ¶ 32.

- On June 23, 2019, Chief Hampton advised his department supervisors: "Any demonstrator standing still (in 1 location) is interfering with the flow of normal traffic.  What we formerly knew as not blocking sidewalks is not the case any further.  No stand still demonstrations without a permit from City Hall."  SUMF ¶ 33.

- On June 27, 2019, City Manager Rose instructed Chief Hampton: "Street musicians should not be stationary on public property in the Loop."  SUMF ¶ 38.

- Following an inquiry regarding whether a performer who did not block the sidewalk would be in violation of the ordinance, University City Police Lieutenant

2

Michael Davis advised two other department supervisors: "Even though the ordinance may not exactly state as such, but the way it is to be enforced as directed from City Hall is that no persons, whether a musician/street performer, protestor, or demonstrator of any kind **cannot** [sic] **Stand Still** (whether they appear to be blocking or not), in any Public Right of Way . . . .").  SUMF ¶ 51.

- On July 3, 2019, Libbey Tucker, Assistant to the City Manager and Director of Economic Development, explained: "Musicians can no longer be stationary and play unless they are sponsored or paid by a business to do so on their private property. . . . The musicians can stroll and play in the right-of-way, but they cannot be stationary." SUMF ¶ 53.

- On July 3, 2019, Director of Planning and Development Clifford Cross told another city employee: "It is my understanding that [musicians] cannot play music in a stationary place within public [right of way]."  SUMF ¶ 55.

University City further prevented individuals from engaging in expression on or adjacent to the Delmar Loop by requiring them to have a permit.  SUMF ¶¶ 67-78, 104-120. City officials, however, repeatedly provided contradictory information: telling performers permits were required, SUMF ¶¶ 21-37, 51, then telling them there was no permit that would allow them to play on public sidewalks, SUMF ¶¶ 42, 53, 56-64.  Officials differed on whether the permit required was a soliciting permit (SUMF ¶ 25), a special use permit (SUMF ¶¶ 67-77), or some other type of permit (SUMF ¶¶ 104-120).

City Manager Rose recently testified that the permit required in 2019 for an individual to engage in expression that would "tend to" obstruct the sidewalk and required today for actual obstruction for any amount of time is a special use permit under Section 505.030 of the University City Code, which applies to uses of the public right of way for "event purposes." SUMF ¶¶ 67-71.  Individuals must apply for a special use permit a minimum of 45 calendar

days before the event and provide information including the estimated number of attendees and a listing of event equipment (such as tents, tables, chairs, stages, portable restrooms, banners, cooking equipment, trash and recycling containers).  SUMF ¶¶ 72, 74.  A permit may be approved by the city manager if the event will not exceed 12 hours; if an event is longer than 12 hours but less than 72 hours, it requires approval of the City Council.  SUMF ¶ 75.  Mr. Rose testified that if a single person wants to stand next to a sandwich board sign and provide information about their political views and pass out literature, that person may need to obtain a special use permit depending on the "amount of activity that is occurring within the Loop" and whether "they are actually obstructing our rights of way."  SUMF ¶ 77.

Pursuant to the ordinance, directives and permit requirement, University City Police stopped Plaintiff Raymond Douglas three times in a short period beginning in late June and early July 2019 to prevent him from playing his unamplified guitar on or adjacent to the public sidewalks in the Loop.  SUMF ¶¶ 135-144.  After the third time he was stopped, Mr. Douglas ceased performing in University City until November 24, 2019, when he was again stopped by a University City police officer while performing unamplified music on the public sidewalk  at a location he believed was in the City of St. Louis but which the officer told him was on the University City side of the city line.  SUMF ¶¶ 145-48.  Each time he was stopped, Mr. Douglas was not obstructing the passage of any pedestrians.  SUMF ¶¶ 4, 7, 157.  The sidewalk was at least 12 feet wide at all locations where Mr. Douglas was prevented from playing music. SUMF ¶¶ 3, 137, 147.  Officers told Mr. Douglas he could not play music in University City but that he may be able to obtain a permit to do so.  SUMF ¶¶ 138, 139, 143, 148.  When he went to inquire about permits, he was told none were available.  SUMF ¶ 139.  On one occasion, Mr. Douglas was performing in the outdoor dining area of a business with the business' express permission and was informed the business would need a permit that would allow him to play.

SUMF ¶ 143.  Mr. Douglas has been told that he cannot play music while stationary and has been threatened with arrest and jail.  SUMF ¶¶ 138, 141, 148, 150.

Similarly, between June 2019 and November 2019 University City Police stopped Plaintiff Raven Wolf C. Felton Jennings II from performing on the Loop four times.  SUMF ¶¶ 209-220.  Each time, Mr. Jennings was performing on private property under the awning of record store Vintage Vinyl with the permission of the store's owner.  SUMF ¶ 206.  The pedestrian passageway, including the public sidewalk and private property below the awning, is 26 feet wide at this location, and Mr. Jennings was not obstructing the passage of any pedestrians.  SUMF ¶¶ 4, 208.  Police officers told Mr. Jennings he needed a permit to perform on the Loop.  SUMF ¶ 211.   When he went to City Hall, Mr. Jennings was provided with a block party permit.  SUMF ¶ 212.  After he returned that form, Mr. Jennings was told instead that Vintage Vinyl would need to obtain a conditional use permit in order for Mr. Jennings to perform.  SUMF ¶¶ 213-15.  The city's planning director also told Vintage Vinyl a conditional use permit was required.  SUMF ¶ 215.  A conditional use permit requires a detailed application including a site plan, a $250 non-refundable fee, and a public hearing.  SUMF ¶¶ 104-120.

Like Plaintiffs, other speakers were prohibited from engaging in free expression on the Loop, including individuals sharing their religious beliefs on the Loop, SUMF ¶¶ 221-228, 246-265; a children's dance group, SUMF ¶¶ 229-245; a group of supporters of then-Presidential candidate Elizabeth Warren who were caroling on the Loop, SUMF ¶¶ 266-278; and a musician who has played the trumpet on the Loop for eighteen years, SUMF ¶¶ 279-294.

On April 28, 2020, Plaintiffs filed this lawsuit and a motion for preliminary injunction. SUMF ¶ 14.  On June 23, 2020, in response to Plaintiffs' motion, University City claimed (contrary to the express statements of City Manager Rose, Chief Hampton and other top officials in recently produced emails) that there "never has been" a policy that prohibited musicians from playing on public sidewalks if they were stationary.  Doc. 16-1 (Declaration of

Gregory Rose) at ¶ 3.  The City further stated the obstruction ordinance would apply only in an "*actual* instance of obstruction of vehicles, traffic or pedestrians."  *Id.*  On June 29, 2020, after Mr. Douglas learned of these statements by the City, he returned to play music in the Loop for the first time since November 2019.  SUMF ¶¶ 152-54.  Although Mr. Douglas was not obstructing any pedestrians, he was approached by an officer and told he could not play music in University City.  SUMF ¶¶ 155-67.  Mr. Douglas was stopped from playing music by police yet *again* on July 13, 2020, although he was permitted to continue to play after intervention by a business owner and police supervisor.  SUMF ¶¶ 168-76.

On July 21, 2020, University City amended its obstruction ordinance to omit the prohibition on "tending to hinder or impede" the passage of pedestrians or traffic.  SUMF ¶¶15-16.  Even so, the City has continued to direct its police officers to enforce the obstruction ordinance in the absence of actual obstruction of pedestrians or traffic.

On March 2, 2021, following an incident in which a business owner complained about members of a religious group near the Chuck Berry statue, Chief Hampton sent his department supervisors an email regarding "U. City Loop Obstruction" and instructing them that no one will be permitted to "set up" in front of the Chuck Berry statue other than "tourists and patrons taking family pictures."  SUMF ¶ 87.  Chief Hampton further instructed: "No tables or large props set up anywhere on sidewalks or throughout the Delmar Loop public access areas without City Hall approval letters from City Officials."  SUMF ¶ 88.

On March 2, 2021, Chief Hampton asked Sergeant Reginald Hope if musicians who were playing in the wide public plaza near the Chuck Berry statue would be in violation of "the directive" where: "The only people that [an officer] observed were 1 W/M and 1 W/F playing guitars on the side of the statue.  Neither of them had amplifiers nor were they blocking the sidewalk."  SUMF ¶ 98.  Sergeant Hope responded: "According to established Loop

procedures, those musicians could have been in violation of the current policy.  Moving forward I will go over the current policy with day watch and the Loop units."  SUMF ¶ 99.

The next day, on March 3, 2021, Sergeant Hope stopped Mr. Douglas and told him he had to move from the location where he was performing on the public sidewalk in the Loop even though Sergeant Hope testified (as is obvious from video of the incident) that Mr. Douglas was not obstructing pedestrian traffic.  SUMF ¶¶ 177, 178, 180, 184, 188.  Mr. Douglas was seated on a chair positioned in an out-of-the-way space between a light pole, trash can, and electrical box at a location where the sidewalk is approximately 31 feet wide.  SUMF ¶¶ 179-182.  Sergeant Hope told Mr. Douglas he could not play music while seated in a chair.  SUMF ¶¶ 186, 189-90.  Chief Hampton specifically directed Sergeant Hope to approach Mr. Douglas after Chief Hampton observed Mr. Douglas on a security camera.  SUMF ¶¶ 197-99.  Chief Hampton testified he determined Mr. Douglas had engaged in obstruction of the sidewalk because he observed a family of four walking east on the sidewalk while at the same time other people were walking west on the sidewalk and the "family of four had to get in a line behind one another in order to pass closer to this gentleman."  SUMF ¶¶ 200-01.  City Manager Rose is aware of the March 3, 2021 incident and believes Chief Hampton "understands what actual obstruction is and he executed the policy consistent with how it's written."  SUMF ¶¶ 203-04.

Similarly, around the same time Chief Hampton sent his March 2 email regarding "U. City Loop Obstruction," a University City police officer told an 80-year-old trumpet player recovering from surgery that he could not perform music while seated in a chair.  SUMF ¶¶ 279-94.  The sidewalk is more than 19 feet wide at the location where this musician had intended to perform.  SUMF ¶ 285.

Two police supervisors testified on May 17, 2021 and June 4, 2021 that they understood Chief Hampton's March 2, 2021 email to be current University City policy.  SUMF ¶¶ 91-92. On May 19, 2021, City Manager Rose testified that under the amended obstruction ordinance

it was possible for "a single individual . . . standing by themselves stationary" to be blocking access to the Chuck Berry statue and that even if there is another path available "an individual should be able to get to the Chuck Berry statue whatever way they choose, if someone happens to be standing there, if you have to take two steps to get around them, you've been obstructed." SUMF ¶ 100.  Mr. Rose stated that "we give great latitude to the police officers that are often enforcing [the obstruction ordinance] to make a judgment decision on whether they believe actual obstruction is occurring."  SUMF ¶ 101.

While the City continues to apply an overly broad and arbitrary interpretation of "obstruction" to musicians and others engaged in expression, it takes a far more permissive approach to obstructions of the public sidewalk by commercial businesses.  Pursuant to University City Code § 400.2220(C), businesses in the Loop may, without a permit, set up a portable sign on the public sidewalk and are directed to keep a four-foot pedestrian zone clear. SUMF ¶¶ 81, 130.  Restaurants may also block public sidewalks with tables, chairs, umbrellas, planters, and railing or fencing from March through December (whether in use or simply as storage), as well as any day the temperature is at least 50 degrees.  SUMF ¶ 122.  Under the City's outdoor dining ordinance, restaurants that set up outdoor dining furniture on the public sidewalks need leave only a four-foot-wide pathway for pedestrians.  SUMF ¶ 123.  Typically, outdoor dining operations on the public sidewalk require a $100 annual permit, but the City has suspended that requirement during the COVID-19 pandemic.  SUMF ¶ 125.  Contrary to the aggressive policing of musicians and individuals engaged in speech, Chief Hampton does not recall the police department ever having been asked to take any action regarding signs that businesses place on the public sidewalks in the Loop, and he has never instructed his officers that they should be taking any action relating to such signs.  SUMF ¶ 82.  Chief Hampton does not recall the police department ever being asked to verify whether a business that has placed a table or chairs on the sidewalk has a proper permit to do so.  SUMF ¶ 129-30.

## LEGAL STANDARDS

A movant is entitled to summary judgment if they can "show that there is no genuine dispute as to any material fact" and they are "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  After the moving party carries this burden, the nonmovant must set forth specific facts demonstrating a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with 'specific facts showing that there is a genuine issue for trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks omitted).

## ARGUMENT

### I.   THE OBSTRUCTION ORDINANCE VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT (COUNT II).

Under the void-for-vagueness doctrine, a law violates due process if it is too vague. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague because it (1) "may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or (2) "may authorize and even encourage arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (same); *accord Gooding v. Wilson*, 405 U.S. 518, 528 (1972) (finding an ordinance is unconstitutionally vague if it leaves "wide open the standard of responsibility, so that it is easily susceptible to improper application" (internal quotation marks omitted)).

"[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19

(2010) (citation omitted).  "This is because '[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs.'" *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012).

### A.   The Original Ordinance Failed to Provide Fair Notice.

The original obstruction ordinance failed to "give fair warning that the allegedly violative conduct was prohibited." *See Stahl*, 687 F.3d at 1040 (citation omitted) (holding an ordinance that "criminalize speech if it has the consequence of obstructing traffic" violated the Due Process Clause).  The Original Ordinance was unconstitutionally vague because it prohibited "[o]bstruct[ing] any public street, public highway, public sidewalk or any other public place or building" by "*tending to* hinder or impede the free and uninterrupted passage of vehicles, traffic or pedestrians." SUMF ¶ 9 (emphasis added).  The phrase "tending to hinder or impede" has no definite meaning.  City Manager Rose testified that under the original ordinance "if an individual was simply stationary for a period of time, it could be interpreted that that person was tending to obstruct." SUMF ¶ 11.  Indeed, officers were instructed to (and did) enforce the ordinance if an individual simply remained stationary while engaged in performance or speech on the public sidewalks.  SUMF ¶¶ 18, 31-51, 98-99.

Laws that forbid conduct "tending to" cause a result are particularly concerning because such language creates additional uncertainty about what is prohibited.  *See Gooding*, 405 U.S. at 519-20 (holding that statute prohibiting the use of "opprobrious words or abusive language, *tending to cause* a breach of the peace" was unconstitutionally vague (emphasis added)); *Gregory v. City of Chicago*, 394 U.S. 111, 119 (1969) (Black, J., concurring) (explaining that "the boundaries of an offense including any 'diversion *tending to* a breach of the peace'" are "infinitely more doubtful and uncertain" (emphasis added)).

In enjoining an obstruction ordinance with language nearly identical[1] to the original obstruction ordinance, a federal district court in Florida concluded a prohibition on "behavior 'tending to hinder or impede' traffic" "has no established meaning, and is not comprehensible to persons of ordinary intelligence." *See Minahan v. City of Fort Myers*, 2014 WL 7177998, at *5 (M.D.Fla. Dec. 16, 2014) (holding that the due process challenge to the portion of the ordinance prohibiting conduct "tending to hinder or impede . . . passage" was likely to succeed on merits). Similarly, a federal district court in Vermont declared an ordinance that made it unlawful to "remain idle" in a public place "so as to . . . [o]bstruct any public street, public highway, public sidewalk or any other public place or building by . . . tending to hinder or impede the free and uninterrupted passage of vehicles, traffic or [pedestrians]" to be "so indefinite that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application,'" and thus unconstitutionally vague. *Derby v. Town of Hartford*, 599 F. Supp. 130, 135 (D. Vt. 1984) (granting plaintiff's motion for summary judgment (quoting *Connally v. Gen. Constr. Co*., 269 U.S. 385, 391 (1926))). The court noted the ordinance gave no guidance as to how long someone could "remain idle," and there was "confusion and wide divergence of opinion as to definitions of key terms" among enforcing officers. *Id.* at 135-36.

University City claims the phrase "tending to" is not confusing or ambiguous, *see* Def.'s Opp'n to Prelim. Inj. Mot. at 13 (Doc. 16), relying on the Supreme Court's decision upholding a municipal anti-noise ordinance using the phrase "tending to disturb." *Grayned v. City of Rockford*, 408 U.S. 104 (1972). In *Grayned*, however, the Court relied on the fact that the ordinance applied only in the specific, narrow context of disturbing the peace of a school session. The Court noted the ordinance was not "a vague, general 'breach of the peace'

---

[1] The relevant part of the ordinance stated it was unlawful to "stand or remain idle, either alone and/or in consort with others, in a public place in such manner so as to . . . [o]bstruct or hinder the movement of traffic on any public street, public highway, public sidewalk, or any other public place or building by hindering or impeding, or tending to hinder or impede, the free and uninterrupted passage of vehicles, traffic or pedestrians." *Minahan*, 2014 WL 7177998, at *1.

11

ordinance, but a statute written specifically for the school context, where the prohibited disturbances [were] easily measured." *Grayned*, 408 U.S. at 112. Unlike the narrowly applicable ordinance in *Grayned*, University City's obstruction ordinance applied broadly to any "public place." Moreover, the Court in *Grayned* noted it was troubled "by the imprecision of the phrase 'tends to disturb,'" but ultimately determined that the ordinance was not unconstitutionally vague because it prohibited "only actual or imminent interference with the 'peace or good order' of the school." *Id.* at 111-12. Here, on the other hand, the obstruction ordinance was not limited to actual interference, as reflected in its language, interpretation or application. *See also Gooding*, 405 U.S. at 528 (holding a statute with the phrase "tending to cause a breach of peace" was unconstitutionally vague because state appellate courts had not construed the statute "so as to avoid all constitutional difficulties" and therefore it "leaves wide open the standard of responsibility, so that it is easily susceptible to improper application"). *See infra* Part I.B.

### B.     The Original Ordinance Encouraged Arbitrary and Discriminatory Enforcement.

The Original Ordinance was also unconstitutionally vague because it was susceptible to discriminatory and arbitrary enforcement. *Kolender*, 461 U.S. at 357. The Supreme Court has emphasized that "the more important aspect of vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Id.* at 357-58 (internal quotation marks omitted).

Here, the original obstruction ordinance "impermissibly delegate[d] to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis.'" *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012) (holding that an ordinance using the "relative, and thus standardless" term "annoyance" violated due process). The original obstruction ordinance empowered police officers to order individuals to move when a single person stood or remained idle in a public place for any length of time and regardless of whether the person was actually

obstructing any pedestrians or traffic.  It failed to provide minimal guidelines to govern law enforcement, and its violation depended upon a police officer's arbitrary interpretation of what constitutes "tending to hinder or impede" the passage of pedestrians (including simply remaining stationary), inviting "arbitrary, discriminatory[,] and overzealous enforcement" in violation of due process.  *Id.* (internal quotation marks and citations omitted).

### C.   The Original Ordinance Was, and the Amended Ordinance Continues to Be, Arbitrarily Applied Without Notice of the Prohibited Conduct.

Even if the Original Ordinance was not unconstitutionally vague on its face, the application of the original and amended ordinance to Plaintiffs violates due process because the ordinance was and is enforced in a manner that "failed to give 'a person of ordinary intelligence fair notice that his contemplated conduct [was] forbidden.'"  *Palmer v. City of Euclid*, 402 U.S. 544, 545 (1971) (reversing conviction under loitering statute because defendant could not have been put on notice of statute's construction as enforced); *see also e.g.*, *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 92 (1965) (reversing conviction under obstruction and loitering statute because it was unclear if trial court relied on vague construction of statute or narrowing interpretation).

Mr. Douglas, Mr. Jennings, and other individuals engaged in speech were directed by officers enforcing the ordinance that they could not remain stationary or that they simply could not play without a permit, regardless of whether they were obstructing.  These directions came from City Manager Rose, Chief Hampton, and other top officials.  SUMF ¶¶ 19-66.

City Manager Rose testified the City currently "give[s] great latitude to the police officers that are often enforcing [the obstruction ordinance] to make a judgment decision on whether they believe actual obstruction is occurring."  SUMF ¶ 101.  Sergeant Hope testified officers make the determination as to whether someone is violating the obstruction ordinance based on "our discretion."  *Id*.  Under the current policy that "large props" are not permitted under the obstruction ordinance, Chief Hampton testified that knowing whether something was

a large prop would require a "visual assessment" by the officer.  SUMF ¶ 94.  Sergeant Lott testified that what may be considered a "large prop" "depends," and is "open to the individual officer's interpretation," and stated, "What's large to me may not be large to someone else." SUMF ¶¶ 94-95.  City Manager Rose testified that if a pedestrian has to merely take two steps out of their way to pass an individual engaged in speech, the speaker could be in violation of the amended obstruction ordinance.  SUMF ¶ 100.

## II.   THE ORDINANCE AND ITS APPLICATION TO PLAINTIFFS VIOLATES THE FIRST AMENDMENT (COUNT I).

The Original Ordinance has unconstitutionally restricted, and the Amended Ordinance continues to unconstitutionally restrict, Plaintiffs' constitutionally protected expression.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment.").

The sidewalks in the Loop are among the traditional public forums "so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely."  *Carey v. Brown*, 447 U.S. 455, 460 (1980).  "Consistent with the traditionally open character of public streets and sidewalks . . . the government's ability to restrict speech in such locations is 'very limited.'"  *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).  The government may enforce content-neutral regulations of the time, place, and manner of expression, but only if the regulations "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

While nominally directed at "obstructing," the ordinance in both its original and amended forms should be analyzed as a regulation of speech because the record reflects the ordinance has, in practice, operated as a substantial bar on protected expression.  *See Langford v. City of St. Louis, Missouri*, No. 20-1488, 2021 WL 2793564, at *2, *5 (8th Cir. July 6, 2021)

14

(declining to analyze ordinance prohibiting the obstruction of traffic as a regulation of speech where "[t]he record does not suggest that the ordinance operates in practice as a substantial bar on protected speech when judged in relation to its plainly legitimate sweep").  Even where a law says "nothing about speech on its face," where a law "restricts access to traditional public fora" it "is subject to First Amendment scrutiny."  *McCullen*, 573 U.S. at 476 (holding a law that forbid individuals from "knowingly enter[ing] or remain[ing] on a public way or sidewalk adjacent to a reproductive health facility" violated the First Amendment).

Here, the record demonstrates not only that the ordinance restricts access to a traditional public forum – the public sidewalks – but also that University City has used the obstruction ordinance to *target* individuals engaged in public expression even when they were not *actually* obstructing the passage of any pedestrians or traffic.  Both the City Manager and the Police Chief instructed that individuals engaged in expression on the public sidewalks should not be permitted to stand still under the ordinance in its original form, SUMF ¶¶ 31-55, and officers carried out these instructions to prevent Plaintiffs, other performers, street preachers and demonstrators from engaging in speech.  SUMF ¶¶ 133-294.

Even assuming the ordinance is not a content-based restriction on speech and that University City has a significant interest in allowing the free flow of pedestrians on its sidewalks, the ordinance in its original form (both on its face and as enforced in practice) and its amended form (as enforced in practice) violate the First Amendment because they are not narrowly tailored to advance this interest and burden substantially more speech than necessary. *See McCullen*, 573 U.S. at 494 (holding that the sidewalk buffer zone around abortion clinics burdened more speech than necessary where the state "ha[d] available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate").  Indeed, while the original obstruction ordinance was in effect, Mr. Douglas and Mr. Jennings and others were repeatedly ordered to

move along even though they were not actually impeding the passage of any pedestrians. SUMF ¶¶ 134-177, 206-219.   And although University City amended the ordinance to eliminate the prohibition on conduct "tend[ing] to" impede traffic, the City continues to apply the ordinance where there is no actual obstruction, as reflected in Chief Hampton's recent instruction that no "large props" are permitted (without respect to whether such "props" are obstructing), the March 2021 stops of Mr. Douglas and Mr. Estes, and Mr. Rose's interpretation that a person has committed "obstruction" if a single pedestrian must take two steps around them.  Enforcing the amended ordinance to prevent musicians from playing when no actual obstruction occurs does not advance any interest in allowing the free passage of pedestrians.

As further evidence that the ordinance targets expression and is not narrowly tailored, the record demonstrates that University City applies a far different standard to businesses that extend their operations onto public sidewalks in the Loop, allowing them to obstruct all but *four feet* of the width of the sidewalk with outdoor dining furniture.  SUMF ¶¶ 123-124.  The outdoor dining furniture that businesses are permitted to set up and store on public sidewalks occupies far more space than a musician in a chair possibly could.   SUMF ¶¶ 126-127. University City has likewise adopted an ordinance allowing businesses to place signs containing commercial speech on the sidewalks of the Loop without a permit; this ordinance similarly requires that a four-foot pedestrian zone be maintained.  SUMF ¶¶ 80-81.  The City's conclusion that a four-foot "pedestrian clear zone" is sufficient to protect its interest in maintaining the free flow of pedestrian traffic in the context of outdoor dining and commercial signs demonstrates that its application of the obstruction ordinance to musicians and others engaged in expression is not narrowly tailored to any significant government interest and burdens substantially more speech than is necessary.  *See Ward*, 491 U.S. at 799 (holding that, to be "no more restrictive than necessary," a law may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").  If a

16

four-foot-wide pathway is sufficient to protect the free flow of pedestrian traffic when commercial businesses are using the public sidewalks, it must also be sufficient when individuals exercising First Amendment rights are using the public sidewalks.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 171–72 (2015) (holding that where a town restricted certain signs more strictly than others, its "distinctions fail[ed] as hopelessly underinclusive" and that it could not "claim that placing strict limits" on certain signs was necessary to achieve its goal "while at the same time allowing unlimited numbers of other types of signs that create the same problem").

The original and amended ordinance, as enforced by the City, also fail to leave open ample alternative channels of communication.  This inquiry is closely related to the question of whether the ordinance is narrowly tailored.  *See Phelps-Roper v. City of Manchester*, 697 F.3d 678, 695 (8th Cir. 2012) (en banc).  As discussed above, the City's enforcement of the ordinance in its original form did not leave open ample alternative channels of communication because Plaintiffs were entirely prohibited from performing in the Loop if they were standing still.  *See Willson v. City of Bel-Nor*, 924 F.3d 995, 1003 (8th Cir. 2019) ("While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." (internal quotation marks omitted)). And the city continues to interpret the amended ordinance to forbid Plaintiffs and others from engaging in expression on sidewalks if their presence may cause a pedestrian to momentarily pause or alter their chosen path in any minor way.  SUMF ¶¶ 100, 200-01.

Alternatively, to the extent the ordinance, in its original and amended form, is analyzed as a regulation of conduct with an incidental effect on expression rather than a "time, place, and manner" restriction on speech, the ordinance fails the applicable four-part test of *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  *Ward*, 491 U.S. at 798 (explaining there is "little,

if any" difference between the *O'Brien* test and the "time, place, and manner" test used to evaluate content-neutral regulations).   Under *O'Brien*, a regulation that restricts speech incidentally may be upheld only if:

> "(1) it is within the constitutional power of . . . the legislature to enact it, (2) it furthers an important or substantial governmental interest, (3) the regulation is unrelated to suppressing free expression, and (4) its restriction of speech is 'no greater than is essential to the furtherance of that interest.'"

*Republican Party of Minn. v. White*, 416 F.3d 738, 749 n.4 (8th Cir. 2005) (en banc) (quoting *O'Brien*, 391 U.S. at 377).   The "no greater than essential" prong is virtually identical to the "narrowly tailored" prong of the test applied to content-neutral laws that regulate speech directly.   *See McCullen*, 573 U.S. at 486 (defining "narrowly tailored" as "not burden[ing] substantially more speech than is necessary to further the government's legitimate interests" (internal quotation marks omitted)).

Here, even assuming the ordinance withstands the first two prongs of the *O'Brien* test, it fails the third and fourth.   The City has used the obstruction ordinance in practice to *target* expression, SUMF ¶¶ 29-66, 77, 130, 133-294, and its practice of broadly applying the ordinance to even fleeting instances of alleged "obstruction" cannot satisfy the fourth *O'Brien* prong because, as explained above, the City is restricting more speech than is necessary to further any legitimate interest, particularly in light of the more permissive rules for tables, chairs, and commercial signs on public sidewalks.   *See Ward*, 491 U.S. at 799 (holding that, to be "no more restrictive than necessary," a law may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

Finally, the ordinance in its original form violated the First Amendment as applied to both Mr. Jennings and Mr. Douglas and the ordinance in its amended form violates the First Amendment as it was applied to Mr. Douglas on March 3, 2021.   At all times when Mr. Douglas and Mr. Jennings were directed by police officers to cease performing, they were engaged in

constitutionally protected expression and were not obstructing the passage of any pedestrians, nor were they violating any other law.  SUMF ¶¶ 4, 7, 102, 157, 180, 188.

## III.   THE NON-STATIONARY POLICY VIOLATES THE FIRST AMENDMENT BECAUSE IT BURDENS SUBSTANTIALLY MORE SPEECH THAN IS NECESSARY FOR DEFENDANT TO ADVANCE A LEGITIMATE GOVERNMENT INTEREST (COUNT III).

University City's policy forbidding any musician or other individual engaged in demonstrations or performance from standing still, regardless of the actual impact the individual has on pedestrian traffic (the "Non-Stationary Policy") violates the First Amendment for the same reasons the ordinance itself violates the First Amendment. *See supra* Part II.

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a 'custom or usage' with the force of law.'"  *Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978)).  "Official policy involves 'a deliberate choice to follow a course of action made from among various alternatives by an official who [is determined by state law to have] the final authority to establish governmental policy." *Id.* (internal quotation marks omitted).

Despite University City's representations to this Court disclaiming the existence of the Non-Stationary Policy, both City Manager Rose and Police Chief Hampton, as well as other top city officials, specifically directed in writing that musicians and others engaged in expression on public sidewalks were not permitted to stand still.  SUMF ¶¶ 31-55, 65-66; *see supra* at 2-3.  Plaintiffs and others who were stopped from performing or engaging in expression were told by officers that they could not do so while standing still or without a permit.  SUMF ¶¶ 27-37, 51, 104-120.

The Non-Stationary Policy directly restricts musical performances, demonstrations, and other public speech on sidewalks.  As with Plaintiffs' First Amendment challenge to the Original Ordinance and Amended Ordinance as applied, the Non-Stationary Policy is not narrowly tailored to serve any significant government interest and burdens substantially more speech than is necessary to further the government's legitimate interest.  *McCullen*, 573 U.S. at 486; *Abdullah v. Cty. of St. Louis*, 52 F. Supp.3d 936, 947 (E.D. Mo. 2014) (holding "an unwritten policy . . . instructing [officers] to order people to keep moving whenever the officers thought it was appropriate to do so" is likely unconstitutional).

## IV.  THE NON-STATIONARY POLICY IS UNCONSTITUTIONALLY VAGUE AND VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT (COUNT IV).

This Court has recognized that a policy that fails to provide citizens with sufficient notice of the conduct that is prohibited and leaves police officers with the unfettered discretion to enforce the policy in an arbitrary manner violates the Due Process Clause.  *See Abdullah*, 52 F. Supp. 3d at 946 (holding policy "requiring peaceful demonstrators and others to walk, rather than stand" unconstitutional).  A policy that "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat" fails constitutional standards of due process. *See id.* (quoting *Kolender*, 461 U.S. at 360).

The enforcement of University City's policy that musicians may not be "stationary" is left to the unfettered discretion of University City officers who enforce the policy in an arbitrary manner.  The Policy provides no guidance to Plaintiffs or to Defendant's officers regarding how long a musician must stand in one spot to be considered "stationary" and thus subject to the policy.  Musicians have no notice of precisely what conduct is prohibited, and instead University City police officers may enforce the Policy in an arbitrary manner, regardless of the actual impact that a musician has on pedestrian or vehicular traffic.  *See supra* Part I.

## V.   THE PERMIT POLICY IS AN UNCONSTITUTIONAL PRIOR RESTRAINT IN VIOLATION OF THE FIRST AMENDMENT (COUNT V).

University City's requirement that musicians may only play in the Loop if pre-approved by the City is an unconstitutional prior restraint on speech. *See Bowman v. White*, 444 F.3d 967, 980 (8th Cir. 2006).  Prior restraints face "a heavy presumption against their validity." *Pence v. City of St. Louis*, 958 F. Supp. 2d 1079, 1083 (E.D. Mo. 2013) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).  Once it is established that Plaintiffs engage in expression protected the First Amendment, which cannot be disputed here, the burden is on the proponent of laws or policies that restrict the right to speak freely. *Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013).

City officials have instructed Plaintiffs to obtain different kinds of permits at different times.  When Mr. Douglas performed in FroYo's outdoor dining area with the manager's permission, he was informed that he could not play music in the outdoor dining area unless FroYo's outdoor dining permit specifically allowed musicians to perform.  SUMF ¶ 143. When Mr. Jennings inquired about permits after being told he needed one, he was first provided with a block party permit.  SUMF ¶ 212.  On July 22, 2019,  Libbey Tucker, Assistant to the City Manager, presented a letter saying the business owners "may contact the City Manager's office for approval" if they "engage[] and support[] a performer on their own private property." SUMF ¶ 59.  Then, that same month, Director of Planning and Development Clifford Cross, with the awareness of City Manager Rose, made the determination that Vintage Vinyl would need to obtain a conditional use permit for Mr. Jennings to perform.  SUMF ¶¶ 112-115. Although the City has stated that its position "with respect to proceedings in this litigation" is that the "playing of unamplified music on private property adjacent to a public sidewalk in the Delmar Loop does not require a conditional use permit," Mr. Cross testified the decision to require a conditional use permit is ultimately up to the city zoning administrator.  SUMF ¶¶ 116-120.

The conditional use permit application processes is costly and burdensome.  The application requires a non-refundable $250 fee; a site plan, survey, or to-scale diagram; and twelve copies of a memo detailing the applicant's historical information, reasoning for venue location, and the estimated impact of the conditional use such as usual traffic volumes at the location and surrounding areas and how the conditional use will affect traffic flow and volume. SUMF ¶ 105-107.  The application must be submitted 28 days in advance of the Planning Commission's regular monthly meeting and must be separately approved by the City Council. SUMF ¶¶ 108-110.

University City has identified no significant governmental interest in regulating the performance of unamplified music by musicians on private property in the Loop.  Although the government may have an interest in maintaining the safety and traversability of *public* sidewalks, the requirement that businesses obtain a conditional use permit in order to allow a musician to play unamplified music on their own *private* property does not serve that interest. University City has identified no interest in requiring business to secure a permit to have a musician play unamplified music on private property without obstructing the public sidewalk. Indeed, the pedestrian passageway where Mr. Jennings performed is approximately 26 feet wide.  SUMF ¶ 208.

Moreover, "the Eighth Circuit has expressed doubt as to the nexus between the licensure of small groups and the governmental interest in managing public spaces."  *See Pence*, 958 F. Supp. 2d at 1085 (citing *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing, as described in *Pence*, "concern about the application of a permit requirement to groups of ten persons")); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009) (en banc) ("[W]e and almost every other circuit . . . have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." (citations omitted)).  Given that is it doubtful that the City could constitutionally enforce its licensing

22

scheme on *public* property, it certainly cannot demonstrate the required nexus between permitting and any interest of the City in regulating unamplified music on *private* property.

## VI.   PLAINTIFFS HAVE BEEN, AND CONTINUE TO BE, INJURED, SO THEY ARE ENTITLED TO RELIEF.

A plaintiff is injured when, as here, a government official unconstitutionally prevents him (even momentarily) from engaging in expressive activity.  *See Johnson v. Minn. Park & Rec. Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (in the preliminary injunction context, holding that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Snider v. City of Cape Girardeau*, No. 1:10-CV-100 CEJ, 2012 WL 6553710, at *2 (E.D. Mo. Dec. 14, 2012) (awarding compensatory damages to litigant who proved constitutional violation despite "no evidence that the plaintiff sustained any physical injury, mental distress, humiliation, financial loss, or other adverse effects" and discussing *Kerman v. City of New York*, 374 F.3d 93, 124–25 (2d Cir. 2004), which also held that "even absent [ ] other injuries," a plaintiff was entitled to damages for a brief unconstitutional impingement on his liberty interest); *aff'd*, 752 F.3d 1149, 1154 (8th Cir. 2014).

Because there is an injury, there is a remedy.  "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 163 (1803).  Plaintiffs are entitled to relief against the ordinances and policy (collectively "University City's policies").

Because Plaintiffs are entitled to summary judgment, declaratory judgment that University City's policies are unconstitutional, facially and as applied, is appropriate. Declaratory judgment is appropriate relief in a § 1983 claim seeking equitable relief, such as this case. *See, e.g.*, *Phelps-Roper v. Koster*, 734 F. Supp. 2d 870, 882 (W.D. Mo. 2010), *aff'd in part, rev'd in part on other grounds, and remanded*, 713 F.3d 942 (8th Cir. 2013). Declaratory judgment is appropriate where resolution of a controversy would benefit from

"specific relief through a decree of a conclusive nature, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998).  In this case, the repeated application of University City's policies to prevent Plaintiffs and others from engaging in their expressive activity provides this Court a solid foundation for a conclusive decree.

As relief for the violation of their constitutional rights, Plaintiffs are also entitled to an award of damages.  A party is entitled to an award of damages when his constitutional rights are violated because of the "importance to organized society that those rights be scrupulously observed."  *Carey v. Piphus*, 435 U.S. 247, 266 (1978).  At a minimum, Plaintiffs are each entitled to nominal damages of $1.00 for the violation of their rights. *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("*Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his [constitutional] right . . . but cannot prove actual injury.").  The Supreme Court recently reaffirmed that relief for a completed violation of a legal right may be remedied in a case that might otherwise be moot by an award of nominal damages. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021).

Plaintiffs are also entitled to a permanent injunction preventing University City from continuing to enforce its policies.  A permanent injunction is appropriate where plaintiffs show: (1) actual success on the merits; (2) irreparable harm; (3) that the harm to the plaintiff outweighs any harm to others from an injunction; and (4) that an injunction serves the public interest.  *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008). Summary judgment in Plaintiffs' favor constitutes success on the merits.  Plaintiffs will suffer irreparable harm if an injunction does not issue, because, absent an injunction, University City will enforce its policies criminalizing Plaintiffs' expressive activity despite it not falling within the narrow zone of expressive activity where the First Amendment might permit the government to interfere.  *Johnson*, 729 F.3d at 1101–02.  The balance of equities weighs in

24

favor of an injunction because there is no evidence of harm to others from the injunction. Indeed, the evidence demonstrates that, beyond Plaintiffs, others engaging in expressive activity are harmed.  Moreover, in University City *other* obstruction of sidewalks in a manner that is prohibited for Plaintiffs is permitted if, instead of musicians, they were a table and chairs or a sandwich-board sign, so University City has demonstrated that any harm to pedestrians is ameliorated by providing them a four-foot clear zone.  Because "it is always in the public interest to protect constitutional rights," *Phelps-Roper*, 545 F.3d at 690, the public interest also favors entry of an injunction.

* * *

For the foregoing reasons, Plaintiffs respectfully request that this Court grant them summary judgment as follows:

A) Find that the original obstruction ordinance was facially unconstitutional because it violates the Due Process Clause;

B) Find that the obstruction ordinance in its original and amended forms is unconstitutional as applied because it violates the Due Process Clause;

C) Find that the original obstruction ordinance violated First Amendment;

D) Find that the ordinance in both its original and amended forms is unconstitutional as applied to Plaintiffs because it violates the First Amendment;

E) Find that University City's Musician Non-Stationary Policy violates the First Amendment;

F) Find that University City's Musician Non-Stationary Policy Violates the Due Process Clause;

G) Find that University City's Permit Policy is an unconstitutional prior restraint that violates the First Amendment;

H) Enter declaratory judgment in accordance with these findings;

I) Enter a permanent injunction prohibiting Defendant from enforcing the Amended Ordinance so long as a four-foot pedestrian zone remains clear;

J) Award Plaintiffs nominal damages; and

K) Provide such other and further relief as the Court deems appropriate.

DATED:  July 20, 2021

Respectfully Submitted,

s/ Lisa S. Hoppenjans
Lisa S. Hoppenjans, #63890 (MO)
Tobin Raju, #5638523 (NY)
First Amendment Clinic
Washington University in St. Louis
School of Law
One Brookings Drive
Campus Box 1120
St. Louis, MO 63130
Phone: (314) 935-8980
lhoppenjans@wustl.edu
tobinraju@wustl.edu

Anthony E. Rothert, #44827 (MO)
Jessie Steffan, #64861 (MO)
Kayla M. DeLoach #72424 (MO)
Molly Carney, #70570 (MO)
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 669-3420
arothert@aclu-mo.org
jsteffan@aclu-mo.org
kdeloach@aclu-mo.org
mcarney@aclu-mo.org

Gillian R. Wilcox, #61278 (MO)
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (314) 652-3114
gwilcox@aclu-mo.org

**ATTORNEYS FOR PLAINTIFFS**