UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RAVEN WOLF C. FELTON JENNINGS II, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   No. 4:20-CV-00584 JAR ) |
| CITY OF UNIVERSITY CITY, MISSOURI, | ) ) ) ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

This matter came before the Court for hearing on July 23, 2021 on Plaintiffs' Renewed Motion for Preliminary Injunction. (Doc. No. 43). Plaintiffs appeared by counsel Lisa Hoppenjans and Tobin Raju; Defendant City of University City, Missouri ("the City") appeared by counsel John Hessel. The parties have submitted proposed findings of fact and conclusions of law. (Doc. Nos. 63, 64). Having considered the arguments and evidence presented at the hearing and in the renewed motion for preliminary injunction, and the proposed findings of fact and conclusions of law submitted by the parties, the Court denies Plaintiff's renewed motion.

## FINDINGS OF FACT

1. Plaintiffs Raven Wolf C. Felton Jennings II ("Jennings") and Raymond Douglas ("Douglas") (collectively "Plaintiffs") are street musicians who perform in the University City Loop Special Business District ("the Loop").

2. On April 28, 2020, Plaintiffs filed this lawsuit against the City pursuant to 42 U.S.C. § 1983 to challenge the constitutionality, both facially and as applied, of a City Ordinance

1

prohibiting obstruction of public sidewalks and alleged City policies forbidding musicians from performing if they were standing still on the public sidewalk ("Non-Stationary Policy") and requiring conditional use permits for musicians to play unamplified music on private property adjacent to public sidewalks.

3. In conjunction with their complaint, Plaintiffs filed a motion for preliminary injunction to enjoin enforcement of the City's Ordinance and other policies, alleging the City relied on the ordinance and policies to broadly prohibit expressive activities on public sidewalks in violation of their constitutional rights to free speech and due process, even when individuals engaged in such activities were not actually obstructing pedestrian traffic.

4. At the time Plaintiffs filed their complaint, City Ordinance § 215.720: Obstructing Public Places (the "Original Ordinance") provided, in relevant part, as follows:

> A.  Definition. The following term shall be defined as follows:
>
> **PUBLIC PLACE**
>
>> Any place to which the general public has access and a right of resort for business, entertainment or other lawful purpose, but does not necessarily mean a place devoted solely to the uses of the public. It shall also include the front or immediate area of any store, shop, restaurant, tavern or other place of business and also public grounds, areas or parks.
>
> B.  It shall be unlawful for any person to stand or remain idle either alone or in consort with others in a public place in such manner so as to:
>
>> 1. Obstruct any public street, public highway, public sidewalk or any other public place or building by hindering or impeding or tending to hinder or impede the free and uninterrupted passage of vehicles, traffic or pedestrians; …
>
> C.  When any person causes or commits any of the conditions in this Section, a Police Officer or any Law Enforcement Officer shall order that person to stop causing or committing such conditions and to move on or

disperse. Any person who fails or refuses to obey such orders shall be guilty of a violation of this Section.

5. Between June 2019 and November 2019, Douglas was stopped from performing in the Loop on four occasions pursuant to the City's Original Ordinance. Likewise, between July 2019 and November 2019, Jennings was stopped from performing in the Loop on four occasions pursuant to the City's Original Ordinance.

6. In June 2020, the City represented that it would not enforce the Original Ordinance in the objected-to manner and would seek an amendment to the Original Ordinance to address Plaintiffs' claims. The City also represented that it would not enforce a Non-Stationary Policy to the extent such a policy existed and would not require a property owner to obtain a conditional use permit to allow musicians to perform outside on private property adjacent to the public sidewalk.

7. In July 2020, the City Council amended the Original Ordinance to add a *mens rea* requirement and delete language that prohibited conduct "tending to hinder or impede" the passage of pedestrians or traffic. The Amended Ordinance now provides:

> B. It shall be unlawful for any person to stand or remain idle either alone or in consort with others in a public place in such manner so as to knowingly and actually:
>
> 1. Obstruct any public street, public highway, public sidewalk or any other public place or building by hindering or impeding the free and uninterrupted passage of vehicles, traffic or pedestrians;
>
> 2. Commit in or upon any public street, public highway, public sidewalk or any other public place or building any act or thing which is an obstruction or interference to the free and uninterrupted use of property or with any business lawfully conducted by anyone in or upon of facing or fronting on any such public street, public highway, public sidewalk, or any other public

3

>   pace or building all of which prevent the free and uninterrupted ingress, egress and regress therein, thereon and thereto …
>
>   C.  When any person causes or commits any of the conditions in this Section, a Police Officer or any Law Enforcement Officer shall order that person to stop causing or committing such conditions and to move on or disperse. Any person who fails or refuses to obey such orders shall be guilty of a violation of this Section.

8. Based on the City's representations and the amendments to the Ordinance, Plaintiffs requested the Court deny their motion for preliminary injunction as moot. On August 25, 2020, pursuant to the parties' Joint Status Report, the Court denied Plaintiffs' motion for preliminary injunction as moot.

9. On April 29, 2021, Plaintiffs renewed their motion for preliminary injunction.[1] They do not now contend the Amended Ordinance is unconstitutional on its face; rather, Plaintiffs argue that certain internal communications and actions taken by the City in March 2021 indicate that the Amended Ordinance is being unconstitutionally applied.

10. Specifically, on March 2, 2021, the City's Chief of Police, Larry Hampton, sent an email to his command staff together with photographs of a group of four men who were members of the Black Hebrew Israelites. The photographs show the men with a camera tripod set up adjacent to a light standard and at least one table and several poster boards or placards in front of the Chuck Berry statue located on Ackert Plaza in the Loop. Chief Hampton's email reminded staff that "tables or large props set up anywhere on sidewalks or throughout the Delmar Loop public access areas" is prohibited "without City Hall approval letters from City Officials" and that there could be no obstruction of the Chuck Berry statue, except for "pictures and brief

---

[1] Plaintiffs do not seek preliminary injunctive relief regarding the City's alleged Non-Stationary Policy or the application of the City's conditional use permit process.

onlookers." Notably, Chief Hampton stated that "[m]usicians and speech groups can continue to play their instruments and practice their free speech elsewhere if they are not violating any laws, ordinances, and private property."

11. The following day, March 3, 2021, Douglas was performing while sitting in a chair on the public sidewalk across from Fitz's restaurant at the northwest corner of Delmar Boulevard and Melville Avenue, in the vicinity of the Chuck Berry statue, when he was approached by City Police Sergeant Reginald Hope. Earlier that day, Chief Hampton observed Douglas on a police surveillance camera take a chair from a nearby business and start performing while sitting in the chair. At that time, it appeared to Chief Hampton that Douglas might be obstructing pedestrian traffic. Chief Hampton directed Sergeant Hope to advise Douglas that he was potentially obstructing in that area. Sergeant Hope told Douglas his chair was "blocking traffic" and that the City wanted to keep the area around the Chuck Berry statue "clear." When Douglas asked if he was blocking traffic, Sergeant Hope responded that "the seat thing is probably the biggest issue" and told Douglas he could sit on the concrete wall to perform at the same location. At no point was Douglas told to stop performing or to move locations.

12. Apart from his March 3, 2021 encounter with Sergeant Hope, Douglas has not had any other interactions with City police officers and continues to perform in the Loop. Since October 2020, Jennings has performed regularly at his chosen location in front of the Tivoli Theatre without incident. Plaintiffs' renewed motion seeks no relief for Jennings.

13. Plaintiffs have also submitted the declaration of another street musician, Albert Estes, II stating that on March 8, 2021 between noon and 2:00 p.m., while exiting his truck to play his trumpet in front of the parking lot between the Tivoli Theatre and PokeDoke, he was

told by a "middle-aged African American" male police officer that he could not play music on the sidewalk in front of the parking lot while seated in a chair. The City investigated the incident and was unable to verify that it happened. Plaintiffs then submitted a second declaration in which Estes states he might have been mistaken as to the date or time of the alleged interaction.

14. Plaintiffs also contend that while the City suppresses expressive activities on public sidewalks in the Loop under the guise of obstruction, it applies a different standard to commercial businesses that extend their operations onto those same sidewalks. City Code § 605.290 related to outdoor dining allows restaurants to secure an outdoor dining permit for the placement and storage of dining furniture on public sidewalks for ten months out of the year. (The City has not enforced its permit requirement during the pandemic.). Restaurants can set up outdoor dining furniture on any day the temperature is higher than 50 degrees. All outdoor dining furniture must be placed in such a way to maintain a minimum four-foot-wide clear zone for pedestrians.

15. City Code also allows commercial businesses to place a portable sign on the public right of way in front of their businesses without a permit, again provided there is a four-foot-wide clear zone for pedestrians.

## CONCLUSIONS OF LAW

16. In deciding whether to grant or deny a motion for preliminary injunction, the Court must consider four factors: (1) the likelihood the moving party will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). The moving party bears the burden of

establishing the need for a preliminary injunction. Chlorine Institute, Inc. v. Soo Line R.R., 792 F.3d 903, 914 (8th Cir. 2015).

17. In cases implicating the First Amendment, courts normally assume irreparable injury because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (citing New York Times Co. v. United States, 403 U.S. 713, 91 (1971)). The Eighth Circuit has adopted this approach. See Iowa Right to Life Committee, Inc. v. Williams, 187 F.3d 963, 970 (8th Cir. 1999). Regarding the public interest and balancing of harm prongs of the Dataphase factors, the Williams court added, "[T]he potential harm to independent expression and certainty in public discussions of issues is great and the public interest favors protecting core First Amendment freedoms." Id. Thus, because of the inherent public interest in free speech and the threat of irreparable injury if speech is suppressed, courts rarely focus on the three latter Dataphase factors; instead, they look primarily to whether the party seeking the preliminary injunction is likely to succeed on the merits. See Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008); Wickersham v. City of Columbia, Mo., 371 F. Supp. 2d 1061, 1075 (W.D. Mo. 2005).

**Likelihood of success on the merits**

18. To establish a claim against a municipality under § 1983, a plaintiff must show that (1) his constitutional rights were violated, and (2) this violation occurred through either an official municipal policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978); Ware v. Jackson Cty., Mo., 150 F.3d 873, 880 (8th Cir. 1998); Fernandez v. St. Louis Cty., Missouri, No. 4:19-CV-01638-SNLJ, 2021 WL 1889914, at *4 (E.D. Mo. May 11, 2021).

19. Plaintiffs allege the Amended Ordinance is unconstitutional as applied because it burdens more speech than necessary for the City to achieve a legitimate government interest and is enforced arbitrarily and in a manner that fails to provide notice of the prohibited conduct. Plaintiffs point to the stops of Douglas and Estes when they were not actually obstructing pedestrian traffic and told they could not perform while sitting on chairs when the Amended Ordinance makes no mention of the use of chairs. Plaintiffs assert that while the City has indicated it intends to prohibit the use of "large props," it has provided no guidance on what constitutes a "large prop." As further evidence that the Amended Ordinance is unconstitutional as applied, Plaintiffs note the City's permissive approach to commercial activity, and particularly outdoor dining, on public sidewalks in the Loop.

20. The City responds that its restrictions, as expressed in Chief Hampton's email prohibiting tables and "large props" on sidewalks and obstruction of the Chuck Berry statue, do not violate the First Amendment nor are they otherwise unconstitutional. Rather, they are content-neutral, reasonable time, place, and manner restrictions designed to afford the public, tourists, and sightseers an opportunity to view and photograph a significant City landmark and leave open ample other places for Plaintiffs to express themselves in the Loop. In further response, the City maintains the Amended Ordinance is sufficiently specific to provide fair warning of prohibited conduct, citing <u>Langford v. City of St. Louis</u>, 3 F.4th 1054, 1059 (8th Cir. 2021). Lastly, the City argues that Plaintiffs' request for injunctive relief based on the City's Outdoor Dining Ordinance is without merit because, among other reasons, it addresses conduct through a permitting process, not speech. <u>See</u> <u>id</u>. at 1058.

21. The parties do not dispute that sidewalks like the ones in the Loop are among the traditional public forums "so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." Carey v. Brown, 447 U.S. 455, 460 (1980). It is also undisputed that music, as a form of expression and communication, is protected under the First Amendment. Ward, 491 U.S. at 790.

22. A government can regulate its public spaces, provided that any restriction on the time, place, or manner of speech in a traditional public forum must be content and viewpoint neutral, leave open ample alternative channels of communication, and be narrowly tailored to further a substantial governmental interest. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citations omitted).

23. A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." Id. at 791 (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)). Such a regulation is neutral "even if it has an incidental effect on some speakers or messages but not others." Id. (citing Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48 (1986)). On its terms, the Amended Ordinance is content-neutral because it does not "require [] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." McCullen v. Coakley, 573 U.S. 464, 479-80 (2014). To the contrary, the Amended Ordinance applies to an individual's conduct only, regardless of whether the individual is also engaged in speech.[2]

---

[2] As Plaintiffs note, the Amended Ordinance is directed at obstruction. Nevertheless, both sides have analyzed the Amended Ordinance as a "time, place, and manner" restriction on speech.

9

24. Content-neutral ordinances "must be narrowly tailored to serve a significant governmental interest." Ward, 491 U.S. at 791. The Amended Ordinance applies to obstruction of "any public sidewalk … by hindering or impeding the free and uninterrupted passage of vehicles, traffic of pedestrians." "[E]nsuring public safety and order" and "promoting the free flow of traffic on streets and sidewalks" are significant governmental interests. McCullen, 573 U.S. at 486-87; see also Madsen v. Women's Health Ctr., 512 U.S. 753 (1994).

25. Plaintiffs do not dispute that the City may have an interest in allowing the free flow of pedestrians on its sidewalks but argue that its continued enforcement of the Amended Ordinance when there is no actual obstruction of pedestrian traffic is not narrowly tailored to advance this interest, and burdens substantially more speech than necessary. Plaintiffs note that at the location where Douglas was stopped on March 3, 2021, the sidewalk is approximately 31 feet wide; at the location where Estes was allegedly stopped, the sidewalk is approximately 19 ½ feet wide. Plaintiffs argue the City applies a much different standard to restaurants in the Loop, allowing them to set up on public sidewalks provided they maintain a four-foot wide "clear zone" for pedestrians.

26. Where a content-neutral ordinance restricts the time, place, or manner of protected speech, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (quotation omitted). However, the regulation "need not be the least restrictive or least intrusive means of doing so." Id. at 798. See also Hill v. Colorado, 530 U.S. 703, 726 (2000) ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring

10

requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal."). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest … the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800.

27. To determine whether a regulation is substantially broader than necessary, courts assess whether the regulation leaves open ample alternative channels of communication. Phelps-Roper, 697 F.3d at 695. "The First Amendment … does not guarantee [speakers] access to every or even the best channels or locations for their expression." Josephine Havlak Photographer, Inc. v. Village of Twin Oaks, 195 F. Supp.3d 1065, 1078-79 (E.D. Mo. 2016) (quoting Carew-Reid v. Metro. Transp. Auth., 903 F. 2d 914, 919 (2d Cir. 1990)).

28. At oral argument, the City confirmed that since the incident involving Douglas on March 3, 2021, no musician, including Plaintiffs, has been stopped or prohibited from performing under the challenged Ordinance, either in its original form or as amended. Additionally, the City noted that Chief Hampton's email referencing large props was in direct response to a situation involving the Black Hebrew Israelites setting up in front of the Chuck Berry statue and did not concern either Plaintiff.

29. Plaintiffs argue that City police officers have unfettered discretion to enforce a vague interpretation of "obstruction" to prohibit conduct even if it does not actually hinder or impede pedestrian traffic, pursuant to Chief Hampton's instruction that no "large props" are permitted and the City's interpretation of "obstruction" to include momentarily requiring pedestrians to slightly alter their path. An ordinance violates the right to be free from a deprivation of due

process if it fails to give fair warning that certain conduct is prohibited. Stahl v. City of St. Louis, 687 F.3d 1038, 1040 (8th Cir. 2012). But where an ordinance "is clear and provides fair notice as to what conduct is deemed likely to cause a traffic problem," it is not unconstitutionally vague. Id. at 1041. Similar to the ordinance at issue in Langford, 3 F.4th 1054,[3] the Amended Ordinance prohibits a person from standing or remaining idle in a public place "in such a manner as to knowingly and actually obstruct any … public sidewalk … by hindering or impeding the free and uninterrupted passage of … pedestrians." The Eighth Circuit found these terms "widely used and well understood," and that citizens should have little difficulty understanding them. Id. at 1059 (citations omitted). The Eighth Circuit further found the ordinance accords with the due process requirement to provide "minimal guidelines to govern law enforcement." Id. "That officers must employ some degree of judgment in determining whether a person has positioned herself in a manner that obstructs the reasonable flow of traffic does not render the ordinance unconstitutional." Id.

30. Plaintiffs' argument regarding the City's Outdoor Dining Ordinance is inapposite. First, the Outdoor Dining Ordinance does not implicate expressive activities. Secondly, allowing a four-foot clearance area for restaurant patrons does not establish that a four-foot clearance area is a reasonable standard under all circumstances. Indeed, Plaintiffs acknowledged that a person standing in the middle of a 19-foot-wide sidewalk, with four feet of clearance, could still be actually obstructing pedestrian traffic. As the City correctly notes, it is not the role of this Court to legislate what constitutes obstruction through the issuance of a preliminary injunction. Again, "[t]he validity of [time, place, or manner] regulations does not turn on a judge's agreement with

---

[3] The ordinance in Langford was primarily addressed to conduct, not speech, and forbid a person from

the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. Ware, 491 U.S. at 799.

31.  Plaintiffs argue the Amended Ordinance does not leave open ample alternative channels because they are entirely prohibited from performing in the Loop if their presence may cause a pedestrian to pause or alter their chosen path in any minor way. This is not the case. According to Sgt. Hope, he spoke with Douglas at Chief Hampton's direction about Douglas's unauthorized use of a chair and the potential for blocking the sidewalk at his location. Douglas did not tell Sgt. Hope he had permission to use the chair. The recording of Sgt. Hope's conversation with Douglas demonstrates that he did not tell Douglas he could not perform or that he needed to leave or move from the area. In fact, Sgt. Hope advised Douglas that he could sit on the concrete structure at his chosen location and continue performing. Douglas left the area because he had to pick up his brother. He continues to perform in the Loop, as does Jennings. The incident with Estes has not been verified.

32.  The Amended Ordinance does not forbid all expressive activities on the sidewalks in the Loop. It merely forbids a person from positioning himself in a way that obstructs the reasonable flow of pedestrian traffic. Plaintiffs have not shown, based on the application of the Amended Ordinance in two isolated incidents that it unduly restricts free speech in light of the City's legitimate interest in regulating pedestrian traffic or that it fails to accord with the due process requirement of fair notice. See Langford, 3F.4th at 1059. Accordingly, the Court finds

---

"positioning" themselves "in such a manner as to obstruct … the reasonable movement of vehicular or pedestrian traffic." St. Louis, Mo., Rev. Code § 17.16.275(A). See Langford, 3 F.4th at 1058.

Plaintiffs unlikely to succeed on the merits of their claim that the Amended Ordinance as applied to them violates their First Amendment rights or rights to due process.

33. Plaintiffs contend the City's enforcement of the Amended Ordinance as applied to target musicians (and others engaged in expression) by broadly interpreting "obstruction" to include conduct that does not actually obstruct the free flow of pedestrians on its sidewalks constitutes a policy or custom that violates their constitutional rights. "Official policy involves 'a deliberate choice to follow a course of action … made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." Ware, 150 F.3d at 880 (citing Jane Doe A v. Special Sch. Dist., 901 F.2d 642, 645 (8th Cir. 1990)). Alternatively, "custom" is demonstrated by "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Jane Doe A, 901 F.2d at 646 (quoting Harris v. City of Pagedale, 821 F.2d 499, 504-07 (8th Cir. 1987)). Ordinarily, a single incident of unconstitutional behavior is insufficient to impose municipal liability. City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).

34. As set forth above, the Court concludes that Plaintiffs are unlikely to prevail on their as-applied challenge to the Amended Ordinance. In the absence of any additional record evidence, the Court further concludes that Plaintiffs have failed to establish a policy or custom that deprived them of their constitutional rights. Any implication of an impermissible policy or custom that could be inferred from the City's past alleged conduct under the Original Ordinance, the incidents involving Douglas and Estes, or from the restriction on blocking the Chuck Berry statue, is outweighed by the fact that to date, no musician, including Plaintiffs, has been arrested,

threatened with arrest, or issued any citation for violating the challenged Ordinance, either in its original form or as amended.

**Threat of irreparable harm**

35. At oral argument, Plaintiffs acknowledged there have been no incidents since March 3, 2021 but asserted there is still a threat of irreparable harm. Preliminary injunctive relief is only warranted where the injury was threatened and *occurring at the time of the motion* and movants demonstrate a likelihood of success on the merits. Weed v. Jenkins, No. 4:15CV140 RLW, 2015 WL 6555413, at *4 (E.D. Mo. Oct. 28, 2015) (emphasis added) (citing Elrod v. Burns, 427 U.S. 347, 373-74 (1976)). Such is not the case here, where Plaintiffs have continued to perform in the Loop without incident and Plaintiffs have not established a likelihood of success on the merits.

**Balance of harms and public interest**

36. Plaintiffs must also establish that the threatened injury to them outweighs the harm a preliminary injunction may cause to the City and that the public interest would be served by the injunction. NTD I, LLC v. Alliant Asset Mgmt. Co., LLC, 337 F. Supp. 3d 877, 889-90 (E.D. Mo. 2018); Noodles Dev., LP v. Ninth St. Partners, LLP, 507 F. Supp. 2d 1030, 1038 (E.D. Mo. 2007). Courts consider, among other things, the threat to each of the parties' rights and whether the non-movant has already taken remedial action. NTD I, 337 F. Supp. 3d at 889. The Court finds the City's interest in ensuring public safety and order and promoting the free flow of traffic on its streets and sidewalks, as well as the public's interest in safety and order and the free flow of pedestrian traffic, outweighs any harm to Plaintiffs. Indeed, as stated above, Plaintiffs, who continue to perform in the Loop, have not demonstrated any irreparable harm. Furthermore, the City has taken remedial action, by amending the Ordinance, by not enforcing the Non-Stationary

15

Policy, and by not requiring conditional use permits for musicians to perform on private property adjacent to public sidewalks. Thus, the Court finds the considerations of balance between harm and injury and of the public interests do not favor Plaintiffs such that the Court must intervene to preserve the status quo until it can determine the merits. Willson v. City of Bel-Nor, Missouri, 298 F. Supp. 3d 1213, 1222 (E.D. Mo. 2018).

**Conclusion**

37. For these reasons, the Court finds and concludes that Plaintiffs have failed to meet their burden of establishing that preliminary injunctive relief is warranted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Renewed Motion for Preliminary Injunction [43] is **DENIED.**

Dated this 22nd day of October, 2021.

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**